Schreiber, J.
Relator brings certiorari proceedings for the tax years 1937, 1938, first half 1939, the fiscal years 1940-41 through 1945-46, and the fiscal years 1947-48 and 1948-49. The proceedings for these years, which exclude 1939-40 and 1946^47, were consolidated because of similarity of the predominant issue in each.
The important or principal question is whether the assessed property is real estate or real property within the meaning of subdivision 6 of section 2 of the Tax Law. If it is, the assessments as made must be upheld; if not, then they must be annulled. An additional factor is involved for the year 1937 which will be adverted to hereafter.
For taxation purposes real estate or real property is defined in subdivision 6 of section 2 of the Tax Law, among other things, as including “ all telegraph lines, wires, poles and appurtenances ; all supports and inclosures for electrical conductors and other appurtenances upon, above and underground, all surface, underground or elevated railroads
The property which was assessed and taxed consists essentially of switchboards and associated wiring installed by relator in quarters which it occupies in buildings owned by others and wiring systems constituting balanced electric circuits installed on the premises of its customers or subscribers. The switchboards maintained by relator in its quarters or offices, leased *992 from different building owners, were connected through wires with the aforesaid systems in its customers’ premises.
It is of importance preliminarily to review briefly relator’s history, the nature of its business and the services it offers and renders to its customers.
Eelator, hereafter referred to as “ Holmes ”, was incorporated in 1883 under the Telegraph Act of 1848 (L. 1848, ch. 265). An Act to provide for the incorporation and regulation of telegraph companies.” Holmes was authorized to engage in a general telegraph business and also in the electric protection business, i.e., the protection of customers’ premises and their contents against burglary and fire. Since its inception, however, Holmes at no time engaged in the general telegraph business but confined its operations solely to the electric protection phase. It is exclusively engaged in rendering such service to its customers against burglary, unlawful entry and robbery.
The electrical communications system which it operates in the rendition of its services and which is the subject of the challenged assessments and taxes consists of the switchboards and related electrical equipment installed by Holmes at its various central offices and the complicated, delicate wiring systems installed by it in each of its subscribers’ premises.
The connection between the central systems and those installed in customers’ premises is in each instance made by a telephone wire leased from the New York Telephone Company by Holmes. This wire runs from the customer’s equipment to the closest telephone company central office. The circuit from that point to one of Holmes’ central offices is completed either by a similar telephone line leased from the telephone company or one owned by Holmes.
Fundamentally the equipment thus installed was used as a means of signal communication by wire. Before closing and leaving his premises the subscriber would press a designated button in his place of business which would result in a signal being transmitted to one of Holmes’ central offices that the place was about to be closed. When this button was pressed, a needle on a galvanometer would move at the Holmes’ central office, a buzzer would sound and the particular subscriber’s premises would be identified by the lighting up of one or more lamps on the Holmes’ central office switchboard.
As soon as these signals were received, an attendant at the central office would test the operation of the electrical circuits between the central office and the subscriber’s premises. If the circuit was found to be functioning properly a button would be pushed at the central office by the attendant “ a prearranged *993 number of times.” This would cause a bell to ring in the subscriber’s premises a corresponding number of times to indicate to the subscriber that the electrical circuit was in good order. If for any reason the test proved unsatisfactory the attendant at the central office would push the button a different number of times “as a signal that the circuit was not functioning properly. ’ ’ In such event the subscriber was required to remain at his premises until the necessary adjustment or repair was made. When the circuit was restored to proper operation the attendant at the central office would push the button the 11 prearranged ” number of times. This then constituted “an all clear ” signal to the subscriber to close up and leave the premises.
Definite and prearranged signals between Holmes and the subscriber were in similar effect when the subscriber’s premises were opened. The mere opening of the door would cause the signals to be received at the Holmes central office. Immediately thereafter the attendant at the central office would push a botton causing a bell to ring in the subscriber’s premises. The attendant would then wait for a coded identifying signal from the subscriber who would push a button the prearranged number of times, known only to himself and the central office. By this means of communication Holmes would know that the subscriber’s premises had been opened by an authorized person.
In addition to the foregoing signalling uses for which Holmes’ systems were designed and installed, it appears that the wiring on the subscriber’s premises was so delicately adjusted as to be easily disarranged or unbalanced by a variety of causes. Wind, rain, leakage, moisture or any entry into the subscriber’s premises after they had been properly closed would unbalance the circuit and cause electrical signals to be transmitted to one of Holmes’ central offices, similar to those which would be received when the premises were opened by an authorized person. WTien this happened there would be no proper response from the subscriber of the coded identifying signal and the attendant in Holmes’ central office would immediately know that the premises had been unlawfully entered or the system accidentally interfered with by atmospheric conditions or otherwise.
Thereupon Holmes would immediately send guards to the subscriber’s premises to investigate. If they found that the disturbance or interference with the functioning of the signal-ling system was caused by anything other than an unlawful entry, it would be restored to proper operating condition. It is interesting to observe that the unbalancing or disarrangement *994 of the signalling electrical system between the subscriber’s premises and Holmes’ central switchboard occurs from accidental causes in almost 99% of the noted cases.
On the other hand, if the guards found that the disturbance to the system was caused by an unauthorized or unlawful entry it was incumbent upon them to contact the police and take whatever steps were proper to protect the subscriber’s premises and property. The guards could also communicate by telephone with the central office over the Holmes’ system by attaching a hand telephone set to the subscriber’s protective circuit.
In addition to the unbalancing or disarrangement of the electrical circuit resulting from accidental means or unlawful or unauthorized entry into the subscriber’s premises, the system was designed for protection against ‘ ‘ holdups ’ ’. A subscriber using this service could transmit an alarm to Holmes’ central office by merely pushing a button. The receipt of such an alarm signal would be immediately telephoned to the police department over a direct line maintained between each central office and the police department.
Further uses were made by Holmes of its electrical communication system by furnishing a night watch signal service, particularly to large institutions such as banks which employed their own watchmen to make periodical tours of inspection. In such cases Holmes installed watchmen’s boxes at various locations on the subscriber’s premises. Each box was affixed to an electric line which in turn was connected to a tape recording machine at one of Holmes’ central offices. The watchman would make his scheduled rounds in a predetermined sequence known only to Holmes and the- watchman. It was the latter’s duty to insert a key or pull a lever at each box in proper sequence. This would cause an ink recording to be made on the register tape in Holmes’ central office, identifying the particular box. In this manner the attendant at the central office was enabled, almost visually to follow the watchman as he made his rounds in the subscriber’s premises to the various boxes. If the recording on the register tape failed to indicate a visit by the watchman to a particular box at the prescribed time, guards would be dispatched to the premises to investigate.
It thus appears that there is a complete, highly ingenious system for the electrical transmission of signals or coded messages utilized by Holmes and its subscribers which enables the one to furnish and the other to receive particular designated types of service. Holmes’ entire business is basically founded upon the transmission and receipt through its system of coded or understood messages by means of electrical appurtenances.
*995 The record indicates that during the years under review and in the borough of Manhattan alone Holmes owned approximately 21,000 miles of wire in underground cables and during the same time and in the same borough leased from the New York Telephone Company approximately 15,000 miles of such wire. These were the means of communication from each subscriber’s premises to the New York Telephone Company central office and from that point to one of Holmes’ central offices.
The assessments to which Holmes objects, include not only its wires in the public streets, but also the extensions of all wires from the end of the street to Holmes’ central offices at one terminal and from the end of the street into the subscribers’ premises at the other terminal.
During the years in question Holmes paid special franchise taxes on its wires and the New York Telephone Company paid similar taxes on the “ leased ” wires in the public streets.
It can hardly be doubted that the system and equipment is used for the transmission by electricity of certain specific well-understood messages between Holmes and its subscribers. Such messages run into countless numbers daily. The system was specifically designed and used to permit communications to be sent and received between distant points by means of electrical impulses in accordance with a prearranged code. Completely comprehensible messages were thus forwarded and in turn received through the medium of electricity.
The conclusion must be reached that this is a telegraph system employed to send messages by electrical apparatus as distinguished from the ordinary means of communication, by speech, letter writing, etc. (Webster’s New International Dictionary [2d ed.]; 26 B. C. L., Telegraphs & Telephones, p. 480). It makes no essential difference whether the messages sent by electricity take the form of alphabetical letters, words, or the ringing of bells or lighting of lamps. The result is the same. Electrical impulses are the means utilized for the transmission and receipt of the messages in accordance with a prearranged understanding or code. For tax purposes the system so employed constitutes telegraph lines, wires and appurtenances within the meaning of the Tax Law.
While not decisive, it is of moment to note that Holmes having been incorporated under the Telegraph Act of 1848, as amended, enjoys an absolute right to place its cables and wires under the public streets without being required to obtain a franchise from the City of New York authorizing it to do so. The Telegraph Act of 1848 permits those incorporated thereunder to place their poles, wires and appurtenances on or over the city *996 streets. This constituted a franchise from the State to Holmes to place its facilities on or over the streets without further consent from.the municipality. Thus when a subsequent statute was passed (L. 1884, ch. 534, as amd.) which required all such equipment to be placed underground, Holmes needed no franchise or approval from the city to do so. (Holmes Elec. Protective Co. v. Williams, 228 N. Y. 407.)
In that case the Court of Appeals indicated that “ [t]he basis of the system [Holmes] was the electrical telegraph.” (Supra, p. 414.) The signal transmitted by a burglar or anyone else who unlawfully or improperly entered a subscriber’s place of business resulted in a “ telegraphed entrance ”. The involuntary or unconscious transmission of notice of entrance constituted a telegraphic message. (See, also, Matter of Owl Protective Co. v. Public Service Comm., 254 App. Div. 600.)
In an analogous situation it has been held that central office telephone installations which were used interchangeably at different locations and removed from time to time from one place to another without damaging anything and which afforded dial service, were properly taxable as real estate under the provisions of subdivision 6 of section 2 of the Tax Law. (Matter of New York Tel. Co. v. Ferris, 257 App. Div. 415, affd. 282 N. Y. 667.) It was unsuccessfully urged in that case that central office equipment was personal property and as such not taxable under the Tax Law.
A similar result was reached as to private switchboards which were installed in the premises of telephone subscribers. These private switchboards were deemed part of an integrated mechanism connecting the telephone instrument of the calling party with outside wires. The switchboards are absolutely essential to the completion of a telephone call. The equipment installed in the central office of the telephone company and the private switchboards placed in the subscribers’ premises constitute in effect a single unit. The fact that they are located on private property does not remove them from the category of taxable real estate within the purview of the Tax Law. (Matter of New York Tel. Co. [Canough], 264 App. Div. 937, affd. 290 N. Y. 537.)
A different situation is presented where the service consists of furnishing electric power or current as distinguished from the transmission of signals or messages by electricity. In People ex rel. New York Edison Co. v. Feitner (99 App. Div. 274, affd. 181 N. Y. 549) the city sought to tax electric meters, switches and wires as real estate. Those appurtenances were used to furnish electric current to consumers. They were owned by *997 the New York Edison Company and located on customers’ premises. In deciding adversely to the city’s contention it was held that there was no provision in the Tax Law which defines such items used for such purpose as real estate.
Here the Tax Law specifically provides for the assessment as real estate for purposes of taxation all telegraph wires or appurtenances. The statute is all embracing and applies regardless of where the property may be situated. The tax is imposed upon the defined items and it is immaterial whether they may be located upon private property in which the persons owning and maintaining the telegraph lines, wires or appurtenances have no interest.
Ordinarily, we might consider the system involved to be personal property or fixtures. It is not for the courts, however, to apply their conception or understanding to the nature of the property. The Legislature has established its own standard by the enactment of subdivision 6 of section 2 of the Tax Law and has defined what constitutes real estate for taxation purposes. That standard embraces the Holmes communication system and is controlling. (Herkimer County Light & Power Co. v. Johnson, 37 App. Div. 257, 264.)
It is true that Holmes is not engaged in the telegraph, telephone or electrical business as those terms are commonly used and understood. Its business is primarily that of furnishing protection for its customers’ property. The contention is advanced that the phrase ‘ ‘ all telegraph lines, wires, poles and appurtenances ” as contained in subdivision 6 of section 2 of the Tax Law includes only such property of telephone and telegraph companies which is devoted to the rendition of the commercial services for which they exist. In other words that it was not intended to include wires or devices as real estate when not used for the specific rendition of telephone and telegraph services as such.
The court cannot accept this narrow and circumscribed view. If the Legislature intended to limit the application of the Tax Law to the designated property of only those companies actually engaged in the telegraph or telephone business, it could readily have so provided. On the contrary it imposed the tax upon all telegraph lines, wires, poles and appurtenances without limitation. Apparently it made no difference whether the defined property was used exclusively in the commercial telephone or telegraph business as such. It is the property itself wherever located that is made taxable as real estate and not the nature of the owner’s business.
*998 In People ex rel. Dexter Sulphite Pulp & Paper Co. v. Hughes (246 N. Y. 35) the question under consideration was whether ‘ ‘ all railroad structures ’ ’ also classified in subdivision 6 of section 2 of the Tax Law as real estate, include those railroad structures owned by private manufacturing companies who are not engaged in the business of carrying passengers or freight for hire. It was held that the phrase “ all railroad structures ” as used in the Tax Law is not restricted to such railroads as are operated by public service corporations for the transportation of persons or property. By parity of reasoning the assessment on the defined property may not be restricted to such companies which are primarily engaged in the commercial telegraph business as such. Likewise Holmes, although not engaged in the commercial telegraph business, cannot conduct its business without the telegraph and electrical systems herein described.
Fundamentally and specifically it is the defined property as such, without regard to the underlying business in which the owner is engaged, which is taxable as real estate within the meaning of the provision of the Tax Law.
The fact that it has been judicially declared that Holmes is not a telegraph company and not engaged in the sale of electric, telephone or telegraph service and that its sole business is that of rendering protective service for its customers (Matter of Holmes Elec. Protective Co. v. McGoldrick, 262 App. Div. 514, affd. 288 N. Y. 635, and Holmes Elec. Protective Co. v. City of New York, 304 N. Y. 202) does not affect in any way the conclusion reached herein.
Those cases involved determinations respectively as to whether certain receipts of Holmes were taxable under the New York City Retail Sales Tax and the New York City Utility Excise Tax Laws. The Retail Sales Tax Law (Local Laws, 1934, No. 20 of City of New York [published as No. 21]) imposed a tax on receipts from sales in the city of gas, electricity, telephone and telegraph service for domestic or commercial use. The Utility Excise Tax Law (Local Laws, 1934, No. 21 of City of New York [published as No. 22]) imposed taxes upon the gross receipts of every utility doing business in the city subject to the supervision of the State Department of Public Service.
The question of the taxable status of Holmes’ equipment or property was not involved. Since the receipts in question did not flow from the operation of a telegraph or telephone service as such but were derived from the rendition of a protective service it was held that they were not taxable as revenue derived from the conduct of a public utility business. Holmes’ cus *999 tomers were not buying telegraph service as ordinarily understood; they were purchasing protection for their premises. Accordingly, its receipts are not taxable under the pertinent local tax laws which affect public utilities.
There is a marked distinction between taxes which are imposed upon property and those levied upon receipts derived from the operation of a business. Even though taxes may not be imposed upon business transactions or receipts in a proper case, that does not exempt or preclude the valid taxation of the physical property used in the conduct of that business. (Railroad Co. v. Peniston, 18 Wall. [U. S.] 5; Western Union Tel. Co. v. Massachusetts, 125 U. S. 530, 552.)
It is further contended in some of Holmes’ petitions to review the assessments in question that .they are invalid and illegal because the State Tax Commission required it to pay corporate franchise taxes under article 9-A of the Tax Law. That article imposes a tax upon the basis of a percentage of net income of certain business corporations. The point is made that since the property assessed here as real estate consists of machinery and equipment used by Holmes in the conduct of its business, it is specifically exempt as personal property from taxation under section 3 of the Tax Law.
The present section 3 of the Tax Law, formerly section 291-1, provides for the exemption from local taxation of personal property of corporations subject to the corporate franchise taxes imposed by article 9-A of the Tax Law. The exempted personal property is defined as “ any movable machinery and equipment used for trade or manufacture and not essential for the support of the building, structure or superstructure, and removable without material injury thereto ”.
The corporate franchise tax on business corporations under article 9-A of the Tax Law is predicated exclusively upon the nature of the receipts of the corporation; the type and nature of the property or assets of the corporation are not involved and have no relation to the basis for the tax. (Matter of McAllister Bros. v. Bates, 272 App. Div. 511, motion for leave to appeal denied 297 N. Y. 1037, citing People ex rel. Goodwin Sand & Gravel Co. v. Law, 207 App. Div. 567, in which a similar-conclusion was reached.)
The fact that certain defined personal property is exempted from taxation under the provisions of section 3 of the Tax Law in the case of' corporations subject to the payment of franchise taxes under article 9-A of the Tax Law does not convert the property here in question from real property as defined in subdivision 6 of section 2' of the Tax Law into personalty. Alt *1000 telegraph lines, wires, poles and appurtenances are stated to be real estate for taxation purposes. These items may not be included or joined by judicial fiat with those enumerated in section 3 and given an exempt status.
Finally it is contended that by assessing Holmes’ property as real estate, a violation of section 4 of article VIII of the State Constitution would result. That article provides that the City of New York may not contract any indebtedness in excess of 10% of the average full valuation of taxable real estate. It is urged that “ real estate ” as expressed in article VIII of the Constitution means only such property as was considered realty at common law and by including the subject property as part of the average full valuation of taxable real estate, the city could avoid or by-pass the 10% indebtedness limitation.
The Legislature has declared in the Tax Law what constitutes real estate for taxation purposes. The City of New York has the right to include such property in determining the aggregate full valuation of all taxable real estate and may then incur an indebtedness up to 10% thereof. It is immaterial that under the common law the subject property would have been personalty. The municipality is sanctioned by the statute to include it as part of the total valuation of taxable real estate. The decreed debt limitation in the mandate of the Constitution is not vitiated thereby.
There is a most serious doubt as to whether under any circumstances legal objections may be made to the classification of items as “ real estate ” in the real estate column of assessment rolls for taxation purposes. (Levy v. McClellan, 196 N. Y. 178.) In that case the taxpayer challenged the inclusion of certain special franchises by the City of New York in its aggregate valuation of taxable real estate. The claim was advanced that by so doing the city was enabled to circumvent the constitutional debt limitation. The court concluded (supra, p. 194) as follows: “ In my opinion, the article of the Constitution, in the respect under consideration [then art. VIII, § 10], must be deemed to comprehend within the term * real estate ’ all properties which the statute makes taxable as such.”
The constitutional interdiction must be read and interpreted in the light of the legislative definition of what comprises real estate for taxation purposes. No infringement upon the constitutional fixation of the city’s maximum indebtedness follows from the inclusion of the valuation of the instant property as real estate.
*1001 An additional reason is advanced for declaring the 1937 assessment against Holmes’ property invalid. It is claimed as to that year that the city failed to comply with the requirements of section 21 of the State Tax Law or former section 890 of the Greater New York Charter (L. 1901, ch. 466). These sections of the Tax Law and the city charter required that the description in the assessment must be such as to enable the taxpayer to identify and locate the property taxed so that he may properly determine the amount of the assessment against his various properties. (People ex rel. Adirondack Power & Light Corp. v. Durey, 123 Misc. 111; Hunt v. Dekin, 187 Misc. 649, affd. 273 App. Div. 800, affd. 298 N. Y. 575; also Matter of City of New York [Harlem Riv. Drive], 199 Misc. 281.)
The court has examined the assessment as made and described in the annual record of assessed valuations of real estate dealing with corporate real estate and special franchises and finds that the property was sufficiently described to enable Holmes to identify it together with the amount of the assessment. It was not necessary to assess separately each individual unit of the telegraph system. It was proper to value the property as a single parcel and Holmes was not misled or prejudiced thereby.
No issues of overvaluation have been raised. The parties entered into a stipulation as to the facts in this matter and reserved the right “ to object to the admissibility of any such facts into evidence ”. The objections filed by the respondents are overruled. In conformity with the conclusions herein reached the court finds that the questioned assessments were validly and properly made. The petitions to review same are dismissed, the writs of certiorari quashed and the assessments confirmed, with costs. Settle order.